UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 19-81163-Civ-Middlebrooks/ Matthewman
(18-80062-Cr-Middlebrooks)

MICHAEL JOSEPH CLARK,

     Movant,

v.

UNITED STATES OF AMERICA,

     Respondent.

_____/

FILED BY _____KJZ_____ D.C.

*Oct 8, 2021*

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION REGARDING MOVANT'S SECOND AMENDED MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE [DE 16]

THIS CAUSE is before the Court upon Movant Michael Joseph Clark's Second Amended Motion to Vacate pursuant to 28 U.S.C. § 2255 [DE 16] ("Motion"), attacking the constitutionality of his conviction and sentence following his guilty plea to three counts relating to the commercial sex acts involving a minor, A.A., in violation of Title 18, United States Code, Sections 159 1(a)(1), (b)(2), and (c) and 2, in the U.S. District Court for the Southern District of Florida, Case No. 18-80062-Cr-Middlebrooks. [DE 16; 17]. The Honorable Donald M. Middlebrooks, United States District Judge, sentenced Clark to 220 months imprisonment on all three counts to all be served concurrently.

This case has been referred to the Undersigned United States Magistrate Judge for a ruling on all pretrial matters and for a report and recommendation on dispositive issues. [DE 51; 58]. The Government answered Clark's Motion [DE 28] and Clark responded [DE 38]. The Court held an

1

evidentiary hearing on Clark's first ground for relief, that is, that Clark's counsel was ineffective for failing to file a requested direct appeal. [DE 70]. This matter is now ripe for review.

## I.   <u>BACKGROUND</u>

### A.  Claims

In his Second Amended Motion under 28 USC § 2255, Clark makes four claims: (1) his counsel, Deric Zacca, was ineffective for not pursuing a direct appeal and not filing a notice of appeal upon Clark's request to do so; (2) Mr. Zacca was ineffective for not investigating the victim and witnesses that could have proven that Clark was innocent; (3) Mr. Zacca was ineffective for not having Clark mentally evaluated under Title 18 U.S.C. §§ 4242-4247; and (4) Mr. Zacca was ineffective for not objecting to Clark's Presentence Investigation ("PSI") report. Each of these claims are addressed separately below.

### B.  The Offense Conduct

Movant Clark was indicted on May 1, 2018 in a Second Superseding Indictment along with codefendant Charles Smith. [DE 23, 18-cr-80062-Middlebrooks]. From October 2017 through March 13, 2018, Charles Smith, a sixty-two-year-old convicted felon using the name Suncoast, operated a brothel and "trap house" where people bought and sold drugs, and females provided sex in exchange for money or drugs. [DE 27-1 at 5-6; DE 27-2 at 141-43, 156; DE 27-3 at 145]. Nothing was happening in that house "but drug use and prostituting," and drugs were a common form of currency for the commercial sex acts. [DE 27-3 at 49, 54]. Smith was there every day and was present – sometimes in the same room – where the drug use and prostitution was occurring. *Id.* at 49-51. Different men were "constant[ly]" coming to the trap house and women were picked up or dropped off there. *Id.* at 145. Men who came to the trap house and engaged in a "trick" had

to pay "the house," which meant they had to pay Smith. [DE 27-2 at 147; DE 27-3 at 48]. And women who worked at the trap house had to pay Smith to be there. [DE 27-3 at 58, 60].

Smith's girlfriend, Barbara Alfonzo had a minor daughter, "A.A." [DE 27-1 at 11, 16; DE 27-2 at 217]. When A.A. was 9 years' old, she was placed in foster care due in part to Alfonzo's drug addiction. [DE 27-2 at 149-50; 27; DE 27-4 at 281]. A.A. repeatedly ran away from the group homes because she wanted to be with her mother, and the state prohibited any contact between them. [DE 27-2 at 151, 154]. During the period of October of 2017 through March 13, 2018, Alfonzo sometimes stayed with Smith and worked at the trap house as a prostitute. [DE 27-3 at 38-41, 51-53, 71]. In late 2017, 14-year-old A.A. joined her mother there. [DE 27-2 at 140-42; 27]. A.A. believed that Smith, whom she knew as "Suncoast", owned and controlled the trap house and that her mother's name was on the electricity and water accounts. *Id.* at 153-54.

When A.A. first arrived at the trap house, she sometimes referred to Smith as her "stepdad" and he similarly referred to her as his "stepdaughter." [DE 27-3 at 38-39]. At some point, Smith began having sex with her and facilitating her work as a prostitute. [DE 27-2 at 141-44, 183; DE 27-3 at 42-43]. He knew that A.A. was a minor. [DE 27-1 at 13, 18 (Smith acknowledged that A.A. was around 15 to 17, not a "damn adult"); *id.* at 25 (Smith told the police that A.A. was "too young to be out running about" and needed to "be in school"). He also knew that she had been in foster care. *Id.* at 22.

Alfonzo left A.A. at Smith's trap house when she was not there. [DE 27-3 at 71]. A.A. lived at the trap house for "several months" and always wore the same attire: "her bra and underwear, day and night." *Id.* at 46-47.

A.A. paid Smith to stay at the trap house but did not have her own room, water, or electricity. [DE 27-2 at 140-44, 147]. Payment was due every day, and she usually paid him with drugs but sometimes she paid with money or sex. *Id.* at 147; DE 27-3 at 46-47, 54-55.

Smith gave A.A. crack cocaine, which they smoked every day, and he also had sex with her. [DE 27-2 at 141-44, 183]. Her addiction to crack worsened and became "very severe" during her time with Smith. [DE 27-3 at 76]. A.A. and other girls had sex for money while at the trap house, and Smith believed that prostitution was the sole source of her income. [DE 27-2 at 141-45]. Angela Lilly, who worked at the trap house as a prostitute, saw A.A. shortly after Alfonzo arrived there. [DE 27-3 at 38-40]. A.A. was "sitting at the kitchen table smoking flakka" with her mother. *Id.* Lilly later saw A.A. and her mother sitting at the same table smoking crack. *Id.* A.A. told Lilly that her mother told A.A. it was okay for her to smoke crack. *Id.* at 40-41. Lilly saw Smith and A.A. together on a bed in the trap house smoking crack. *Id.* at 42-43. He asked Lilly to leave so that he and A.A. could be alone together, which Lilly interpreted as meaning that they were going to sexually engage. *Id.* She also saw A.A. sit on Smith's lap with her legs spread wide while they smoked crack. *Id.* at 46.

A.A. never arranged her own prostitution dates. *Id.* at 53. Smith would bring people at the house to A.A. for prostitution dates or make arrangements by phone. [DE 27-2 at 144-45]. At other times, women working in the trap house, including Alfonzo, would provide A.A. with customers. [DE 27-3 at 53].

Clark, a common visitor to the trap house, had sex with A.A. and arranged for her to have sex with a man on March 13, 2018, in exchange for $150. *Id.* at 147-48 (neighbor testified Clark was a common visitor); DE-4 at 238 (Clark told A.A. "I be in that house, I be with, I see what's going on"); *Id.* at 196 (confirming A.A. will provide a commercial sex at 7:45 p.m. in exchange

for $150). Clark also was a drug dealer and involved with the drug related activities at the trap house. [DE 27-3 at 55-56, 72].

One night two men named Tom and Larry asked Smith to provide them with "dates" who would perform "sex for money." *Id.* at 23; 32; 48. Lilly told Smith that she was not interested in conducting a commercial sex act with them, so then Smith arranged for A.A., who was wearing her bra and underwear, to go out to their car. [DE 27-2 at 146; DE 27-3 at 28-32, 47-48]. A.A. went with them that night and "numerous" other times. *Id.* Tom and Larry became A.A.'s "regular" clients and Tom called Smith to arrange dates with her. *Id.* A.A. referred to Tom and Larry as her clients who had a boat. [DE 27-3 at 31-32; DE 27-4 at 77-85]. Lilly testified that A.A. got into the car "numerous times" with "these people," and that they paid A.A. for their "dates" and they also paid Smith "for getting [A.A.] to come with them initially." [DE 27-3 at 47]. Lilly saw A.A. give Smith money for those dates, as well as for many dates in the trap house that occurred with other men associated with Smith. *Id.* at 47-48, 53-54.

Alfonzo also worked at the trap house. *Id.* at 38-41, 51-53, 71. One time Alonzo borrowed Lilly's phone to speak with a prospective client. *Id.* at 51. When the man arrived, Alfonzo went outside and spoke with him. *Id.* After a couple of minutes, a "jealous" Alfonzo went back inside the trap house and instructed A.A. to "'[g]o out there'" because "'[h]e wants to see you.'" *Id.* When A.A. said that she did not want to "see that guy,'" her mom insisted. *Id.* As A.A. was reluctantly walking out the door pursuant to her mother's instructions, Lilly gave her cell phone number to A.A. and told her to call if she felt "unsafe." *Id.* at 51-52. About two minutes after the car pulled away with A.A. inside, Lilly's cell phone rang, and the caller ID showed that it was the number of A.A.'s new client. *Id.* at 52. A.A. did not have her own phone and Lilly, believing that the incoming call was from A.A., gave the phone to A.A.'s mom, who expressed no interest in speaking to her

daughter. *Id.* A.A. returned in the same car about an hour later and handed her mother around $50 in cash. *Id.* at 53.

On March 13, 2018, West Palm Beach police officers executed a narcotics search warrant at the trap house where they believed Clark lived. *Id.* at 80. During the execution of the warrant, they discovered an adult male and 14-year-old A.A. sleeping in a "bedroom." [DE 27-2 at 122-23, 126-27, 191, 203, 205]. A.A. was wearing a black sports bra, shorts, and socks. *Id.* at 204. A.A. subsequently told officers that she had been living at the trap house and had had sex with Smith. *Id.* at 124-25, 195. While being interviewed at the West Palm Beach Police Station, officers gave A.A. a cellular telephone so that she could make calls. *Id.* at 166. Unbeknownst to A.A., those calls were recorded. *Id.* at 164-66. She called her mother and others trying to determine if Clark, whom she considered her "best friend," was okay. *Id.* at 165-68. She later made several calls to Clark, expressing her love and her gratitude that he was not present when officers searched the trap house. [DE 27-4]. The conversations between Clark and A.A. made it clear that he knew she was a minor and that they had engaged in sexual activities together in the past. *Id.* According to the conversations and the testimony of Karl Kamella, one of Smith's neighbors, Clark frequently visited A.A. at the trap house. [DE 27-3 at 146-48].

Clark was with A.A. at the trap house the night before the search but he left because they had a fight. *Id.* at 18-19. She expected him to return the following day, and she was worried that the police would arrest him because she was a minor. [DE 27-2 at 158, 162-63]. During one conversation on March 13, 2018, A.A. and Clark discussed a $150 prostitution date arranged for her at 7:45 that evening. [DE 27-4 at 196]. Clark provided her with the details of the date and coordinated the arrangements with the client. *Id.* at 194. A.A. told Clark that she would keep the date. *Id.* Clark was worried about the police. *Id.* at 204-05. He asked A.A. if the police were

recording her conversations and instructed her to "[w]ipe out" the phone she was using and "those text messages" because "they trying to see if you been fuckin' with stuff over there" *Id.* He speculated that "they might try to charge [Smith] with Child Endangerment or something," because the police had found A.A. "in a trap." *Id.* Clark "want[ed] to make sure everything's alright cause God damn it, they pressure him, ain't no tellin' what he might tell cracker." *Id.* at 205-06. A.A. reassured Clark: "And I don't know why the fuck you actin' like you worried. . . , cause . . . I ain't say nothin' about you. I don't even know what the fuck your name is. They don't even know who you are." *Id.* She also assured Clark that she had wiped the phone and there would be no record of their calls, not realizing that the police were recording all her telephone conversations. *Id.*; DE 27-2 at 166. Clark updated A.A. with information that he had obtained from Smith and opined that it looked like the police were "tryin' to jam" Smith up because "[h]e says he got a gun in there." [DE 27-4 at 223]. When A.A. later told Clark that the police had arrested Smith for possessing the gun, Clark again confirmed that Smith had told him about the shotgun he kept in his trap house. *Id.* at 300.

A.A. also had a list of telephone numbers, including Clark's, which was noted with a "BF" which law enforcement believed meant boyfriend. [DE 27-3 at 25-27]. In another list, his number was referenced with the contact name "Punkmeat" which is a known alias for Clark. *Id.*

### C. Change of Plea Hearing

At his initial appearance in the underlying criminal case, the Court appointed Deric Zacca, Esq., to represent Clark as CJA counsel. [DE-23, 18-80062-cr-Middlebrooks]. Clark subsequently signed a written plea agreement on June 20, 2018. [DE 27-5]. Clark's change of plea hearing occurred on June 20, 2018. [DE 27-8]. The Court described the possible penalties for the crimes he was pleading guilty to. *Id.* at 5-6. The Court explained that as part of the plea agreement, Clark

was giving up his right to appeal the sentences unless it were to exceed the maximum or be the result of an upward variance from the guideline range. *Id.* at 9-10. The Court asked if Clark understood, and Clark said "Yes." *Id.* at 10. The Court asked if anyone attempted to force Clark to plead guilty, and Clark said "No." *Id.* The Court asked if Clark was pleading guilty because he is guilty, and Clark said "Yes, sir." *Id.* The Court recognized the written statement of facts within the plea agreement but asked the prosecutor to briefly describe what the Government would have proven at trial. *Id.* The Court asked Clark to listen carefully because when the Government finishes, "I'll ask you whether you did what the government says you did." *Id.* When the Government finished, the Court asked if Clark did those things, and Clark said "Yes, sir." *Id.* at 14. The Court asked specifically, "You helped arrange for this 14-year-old to have sex for money?" *Id.* Clark responded "Yes, sir." *Id.* Then the Court found that the plea was knowing and voluntary and the appellate waiver within the plea agreement was also knowing and voluntary. *Id.* at 15.

The written plea agreement contained, *inter alia*, the following factual statement:

> Law enforcement began to focus its investigation on MICHAEL JOSEPH CLARK a/k/a Punkmeat. They had several previous contacts with Clark. In April 2018 Clark gave law enforcement his phone number, XXX-XXX-2154, as a contact number. On April 30, 2018, Minor A was recovered after she attempted to run away. She had three pieces of paper with a list of her phone numbers on it. On that list, she had "punkmeat" XXX-XXX-2154 which matches the phone number that he previously gave law enforcement as his contact. During the initial interview that occurred on March 13, 2018 at the WPBPD, Minor A called Clark on Clark's cell phone. Clark used his cell phone to arrange for Minor A to meet with an adult male to engage in sex in return for money. Clark also knowingly and willfully combined, conspired, confederated, and agreed with others known and unknown to the Grand Jury, to knowingly, in and affecting interstate commerce, recruit, entice, harbor, transport, provide, obtain, maintain, or solicit by any means a person, knowing, and in reckless disregard of the fact, and having had a reasonable opportunity to observe Minor A, that Minor A had not attained the age of 18 years at the time of the offense and would be caused to engage in a commercial sex act. Clark knew that Minor A had not attained the age of 18 years at the time of the offenses charged in this case. All the events listed above occurred in the Southern District of Florida.

[DE 27-5 at 4-6].

### D. PSI Report and Sentencing Hearing

Prior to sentencing, a PSI was prepared which assigned Clark a base offense level of 30, pursuant to USSG § 2G1.3(a)(2). [PSI ¶ 26][1]. Two levels were added for each of the following specific offense characteristics: unduly influencing a minor; use of a computer; and the commission of a sex act or sexual contact. [PSI ¶¶ 27, 28, 29 (citing USSG § 2G1.3(b)(2), (b)(3)(B), and (b)(4), respectively)].

Clark received a three-level decrease due to his timely acceptance of responsibility. [PSI ¶ 35-36]. His total offense level was 33. [PSI ¶ 37]. Clark's criminal convictions placed him in criminal history category VI. [PSI ¶ 63].

The PSI also reflected numerous other arrests that did not result in convictions. [PSI ¶¶ 64-71]. With an offense level of 33 and a criminal history category of VI, Clark's guideline range was 235 to 293 months' imprisonment. [PSI ¶ 92]. Clark's statutory maximum was life imprisonment. [PSI ¶ 91].

Clark was sentenced on September 20, 2018. [DE 27-10]. At the start of the sentencing hearing, the Government stated its recommendation was 188 months out of the 235-month sentence per the sentencing guidelines. *Id.* at 2-3. The Government agreed not to request enhancements for use of a computer and the Court adopted the remaining calculations in the PSI. *Id.* at 3. The Government explained that even though Smith and Clark were similarly situated and equally culpable, Clark, unlike Smith, came forward, plead guilty, and assisted the Government. *Id.* at 3.

Then, Mr. Zacca argued for the downward variance for Clark. *Id.* at 3-13. Mr. Zacca pointed out that Clark cooperated with the Government and the Government was interested in his

---

[1] The PSI is at docket entry 149 in Clark's underlying criminal case, No. 18-80062-Cr-Middlebrooks.

cooperation. *Id.* at 9-10. He pointed out that Clark accepted responsibility early and agreed to plead guilty as charged in the indictment. *Id.* Mr. Zacca also pointed out that Clark was available to testify in Smith's trial and provided information about two other targets—A.A.'s mother and a "violent pimp." *Id.* at 10-11.

The Court determined that Clark's guideline range was 188 to 235 months of imprisonment, based on an offense level of 31 and a criminal history category of VI. *Id.* at 13. When considering the appropriate sentence to impose under § 3553(a), the Court emphasized that Clark had committed a very serious crime. *Id.* The Court found that both Smith and Clark had severely injured the minor victim. *Id.*

The Court stated that "I am convinced, however, by counsel . . . that Mr. Clark did, unlike the other defendant, take steps to try to cooperate and has expressed a willingness to cooperate in the future in additional prosecutions. And while I had intended, frankly, to sentence him to the same[,] I am going to vary based on that fact." *Id.* at 14. Then the Court sentenced Clark to 220 months imprisonment as to each of Counts 1, 2, and 3, all to be served concurrently, to be followed by a lifetime of supervised release. *Id.*

Then, the Court addressed Clark. *Id.* 15-16. The Court said "Mr. Clark, you have a right to appeal the sentence imposed. Any notice of appeal must be filed within 14 days. Failure to file a notice of appeal within that period would constitute a waiver of you right to appeal." *Id.*

### E.  Evidentiary Hearing

Upon review of Clark's Motion, the Court issued an order appointing counsel and setting an evidentiary hearing solely on Clark's first ground for relief, that is, that his counsel was ineffective for failing to file a requested direct appeal. [DE 39]. The Court held an evidentiary hearing on August 20, 2021. [DE 70]. The Government's Exhibit 1 (Composite Exhibit of Mr.

Zacca File), Exhibit 2 (Clark's Plea Agreement), Exhibit 3 (Transcript of Change of Plea Hearing) and Exhibit 4 (Transcript of Sentencing Hearing) were admitted in evidence without objection. [DE 70; DE 71].  Clark testified on his own behalf. *Id.* The Government called Mr. Zacca to testify. *Id.* The relevant testimony of the witnesses and the relevant portions of the admitted exhibits are summarized below. [2]

<u>Clark's Testimony at the Evidentiary Hearing</u>:

Clark testified at the evidentiary hearing before the Undersigned Magistrate Judge as follows. Clark testified that he stated under oath to District Judge Middlebrooks that he was guilty even though he was actually innocent of the crimes he plead guilty to because he felt like he had no other choice but to plead guilty. Clark testified that he lied to Judge Middlebrooks at the change of plea hearing.  Clark signed a written plea agreement that contained a factual proffer where he agreed that he engaged in the sexual trafficking of a 14-year-old minor. Clark knew that he was facing a life sentence for each of the charges brought against him. Clark also understood that he received a sentence that was below the guideline sentencing range. Clark wanted to appeal because he received a longer sentence than he thought he would receive, and Clark wanted to appeal because he is actually innocent of the crimes to which he plead guilty.

Clark testified that Mr. Zacca came to visit him in FDC-Miami about a week after his sentencing.  Mr. Zacca told Clark that he had a right to appeal, and that Mr. Zacca would file a notice of appeal on his behalf if Clark wanted him to do so. Mr. Zacca told Clark he had fourteen days to appeal, and Clark said, "I want to appeal the sentence."

---

[2] The testimony has not been formally transcribed and made part of the record. The narrative contained herein is a summary of testimony as recalled by the Undersigned Magistrate Judge

According to Clark, Mr. Zacca told Clark that if he appealed and it went to trial, Clark would be looking at a life sentence and Clark would probably get a life sentence. Clark trusted Mr. Zacca and believed that if he appealed, "it wasn't going to work" and he would get a life sentence. Clark "believed in [his] lawyer." Clark also felt coerced by his lawyer because Mr. Zacca said he would get a life sentence and Mr. Zacca talked him out of appealing. Clark felt like he had no choice regarding whether to take an appeal, so he signed Mr. Zacca's letter memorializing their discussion, indicating that he did not want to appeal. Clark did not subsequently request that Mr. Zacca file a notice of appeal, even though he wrote Mr. Zacca a letter after the meeting on another matter.

Attorney Derec Zacca's Testimony at the Evidentiary Hearing:

Mr. Zacca testified as follows. Mr. Zacca began practicing law in 1998 and his career has primarily been in criminal defense work. Mr. Zacca has been Board Certified in Criminal Trial Law by The Florida Bar since approximately 2005 and was so certified when representing Clark. Presently, Mr. Zacca serves as an Assistant U.S. Attorney in the Southern District of Florida.

Clark never expressed to Mr. Zacca that he was innocent of the crimes charged; in fact, Clark wanted to plead guilty. Clark knew that if he provided substantial assistance to the Government, there was a possibility of a Rule 35 reduction in his sentence. [Ex. 1 at 10].

At the sentencing hearing, when Mr. Zacca perceived that the Court was hesitant in the Government's recommendation, Mr. Zacca strongly advocated for the downward variance for Clark. [Ex. 4 at 3-13]. Mr. Zacca pointed out that Clark had cooperated with the Government and the Government was interested in his cooperation. *Id.* at 9-10. He pointed out that Clark accepted responsibility early and agreed to plead guilty as charged in the indictment. *Id.* Mr. Zacca also pointed out that Clark was available to testify in Smith's trial and provided information about two

other targets.  *Id.* at 10-11. Ultimately, Clark was given a sentence that was fifteen months below the top end of the guidelines but was still higher than the Government's recommendation.

Mr. Zacca visited Clark several times while he was in custody. When Mr. Zacca wanted to see a detained client in FDC-Miami, his practice was to send a letter to the Bureau of Prisons requesting the visit, and then email the letter to the assigned email address for the BOP.  [Ex. 1]. It was also Mr. Zacca's practice to use the reminder function in his email account to remind himself of important deadlines, such as filing a notice of appeal.  Mr. Zacca used the reminder function on his email to alert him of the deadline for Clark's appeal.  *Id.* at 5. His October 2, 2018 calendar reminder informed that Clark's deadline to appeal was October 5, 2018.  *Id.*

On October 2, 2018, Mr. Zacca went to visit Clark at FDC-Miami.  [Ex. 1]. During that visit, Mr. Zacca reviewed the results of the sentencing hearing with Clark and discussed with Clark his right to appeal.  *Id.* at 5; 10.  Clark told Mr. Zacca that he did not want to appeal.

Prior to visiting with Clark, Mr. Zacca drafted a letter, and he took that letter to Clark during the October 2, 2018 visit. *Id.* at 9.  The letter memorialized the discussion he would have with Clark.  *Id.*  The letter informs that the deadline to appeal is fourteen days from the date the judgment was entered, September 21, 2018. *Id.* It explains that the appeal must be filed timely and that he would file the appeal if Clark wanted him to file it. *Id.* Mr. Zacca also provided Clark his legal opinion that an appeal of his sentence would not be successful because he did not "believe the Court committed any errors during [Clark's] sentencing hearing. Furthermore, the Court sentenced you below the guideline rage." *Id.*  Clark signed the form stating that he did not want to appeal. *Id.* Mr. Zacca did not coerce or force Clark to sign the letter. Mr. Zacca did not say that if he filed an appeal Clark would lose the possibility of the Rule 35 reduction in his sentence.

## II.   **APPLICABLE LAW**

Because collateral review is not a substitute for direct appeal, the grounds for collateral attack on final judgments pursuant to § 2255 are extremely limited. A prisoner is entitled to relief under § 2255 if the court imposed a sentence that (1) violated the Constitution or laws of the United States, (2) exceeded its jurisdiction, (3) exceeded the maximum authorized by law, or (4) is otherwise subject to collateral attack. 28 U.S.C. § 2255(a); *McKay v. United States*, 657 F.3d 1190, 1194 n.8 (11th Cir. 2011). Thus, relief under 28 U.S.C. § 2255 "is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice." *Lynn v. United States*, 365 F.3d 1225, 1232 (11th Cir. 2004) (citations omitted). If the Court finds a claim under § 2255 to be valid, the Court shall vacate and set the judgment aside and shall discharge the prisoner, grant a new trial or correct the sentence. 28 U.S.C. § 2255. The burden of proof is on the movant, not the Government, to establish that vacatur of the conviction or sentence is required. *Beeman v. United States*, 871 F.3d 1215, 1221-1222 (11th Cir. 2017).

To prevail on a claim of ineffective assistance of counsel, the movant must demonstrate both (1) that counsel's performance was deficient, and (2) a reasonable probability that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984).  If the movant cannot meet one of *Strickland's* prongs, the Court does not need to address the other prong. *Id.* at 697.

To show counsel's performance was unreasonable, a movant must establish that "no competent counsel would have taken the action that his counsel did take." *Gordon v. United States*, 518 F.3d 1291, 1301 (11th Cir. 2008) (quoting *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000)). To establish prejudice, a movant must establish that, but for counsel's deficient

performance, the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694. For the Court to focus merely on "outcome determination," however, is insufficient; "[t]o set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him." *Lockhart v. Fretwell*, 506 U.S. 364, 369-70 (1993). A movant, therefore, must establish "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 369 (quoting *Strickland*, 466 U.S. at 687).

It is beyond dispute that habeas movants bear the burden of proof in habeas proceedings. *Blankenship v. Hall*, 542 F.3d 1253, 1270 (11th Cir. 2008); *Hill v. Linaham*, 697 F.2d 1032, 1036 (11th Cir. 1983). *See also* 28 U.S.C. § 2255(b), (e); Rule 2 and 4 of the Rules Governing Section 2255 Cases. This axiom is so well-settled that *Strickland* itself placed the burden of proof on habeas litigants, who, like Clark, seek to invoke the Sixth Amendment doctrine. *See generally Strickland*, 466 U.S. at 695-96; *Shiver v. United States*, 619 F. App'x 864, 865 (11th Cir. 2015). Thus, by requiring habeas litigants to bear the burden of showing constitutional error, criminal proceedings are treated as "valid until proven otherwise." *Occhicone v. Crosby*, 455 F.3d 1306, 1310 (11th Cir. 2006).

## III.  DISCUSSION AND ANALYSIS

### A. Whether Clark's Counsel Was Ineffective For Not Filing A Notice Of Appeal Upon Clark's Request To Do So

Clark asserts that Mr. Zacca was ineffective for not pursuing a direct appeal when Clark requested that Mr. Zacca do so. [DE 16 at 5; DE 17 at 1]. According to Clark, he instructed Mr. Zacca to file a notice of appeal twice—the day of sentencing when they were in the courthouse and a few days later when Mr. Zacca came to visit Clark at the FDC-Miami Jail. [DE 17 at 2]. Clark asserts that on both occasions, Mr. Zacca informed Clark that he could not appeal because

he "waived [his] appeal rights by pleading guilty." *Id.*  Clark contends that he wanted to appeal because he was actually innocent of the crimes, he involuntarily accepted the plea, and he received more time than he was promised by Mr. Zacca. *Id.* 2-3. Clark asserts that "[b]ut for counsel's refusal to appeal, the proceedings would have been so much different." *Id.* at 3.  The Court finds that Clark has not demonstrated that he is entitled to relief under *Strickland*.

The law is clear that counsel's failure to file a direct appeal after being requested to do so by his client results in a *per se* constitutional violation of the movant's Sixth Amendment right to counsel, which entitles a defendant to an appellate proceeding. *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) ("We have long held that a lawyer who disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable.").

There is a presumption of prejudice "with no further showing from the defendant of the merits of his underlying claims when the violation of the right to counsel rendered the proceeding presumptively unreliable or entirely nonexistent." *Id.* at 484. A movant need not establish that his direct appeal would have been arguably meritorious; he need only show that his counsel's constitutionally deficient performance deprived him of an appeal he would have otherwise taken-*i.e.*, the defendant expressed to his attorney a desire to appeal. *Id.*

Even when a defendant has not specifically instructed his counsel to file an appeal, in order to determine whether counsel performed deficiently, the Court must inquire into whether counsel in fact consulted with the defendant about an appeal. *Id.* at 478. "If so, the attorney has only acted unreasonably if he has ignored the client's wishes to appeal the case.  If not, the court must further inquire whether the attorney had an affirmative duty to consult." *Gomez-Diaz v. United States*, 433 F.3d 788, 791-92 (11th Cir. 2005) (citing *Roe*, 528 U.S. at 478). The duty to consult arises when either: (1) any rational defendant would want to appeal; or (2) the defendant reasonably

demonstrated an interest in appealing. *Id.* (citing *Roe*, 528 U.S. at 480). "[T]o show prejudice in these circumstances, a defendant must demonstrate that there is a reasonable probability that, but for counsel's deficient failure to consult with him about an appeal, he would have timely appealed." *Roe*, 528 U.S. at 484.

In this case, it is uncontested that Mr. Zacca consulted with Clark about his right to appeal. Moreover, the argument in Clark's Motion that Clark instructed Mr. Zacca to file a notice of appeal and counsel failed to do so on Clark's instructions is refuted by Clark's own testimony. Instead, Clark testified that Mr. Zacca discussed taking an appeal with Clark, he told Mr. Zacca that he wanted to file an appeal, but ultimately abandoned his request after being either advised or coerced by Mr. Zacca. Under either of Clark's theories, his argument fails.

The Court finds that Clark's testimony during the evidentiary hearing is not credible. In fact, the Court finds that Clark perjured himself at the evidentiary hearing held before the Undersigned Magistrate Judge on August 20, 2021. First, at the August 20, 2021 evidentiary hearing, Clark testified that he lied to District Judge Middlebrooks at his change of plea hearing. Clark specifically testified that he lied to District Judge Middlebrooks when he admitted he was guilty because he was actually innocent. After carefully considering the credibility and observing the demeanor of Clark at the August 20, 2021 evidentiary hearing, the Court finds that Clark clearly lied at the evidentiary hearing before the Undersigned. Clark also has the motivation to lie because he is upset that his sentence is higher than what he had hoped for and higher than what the Government recommended.

Second, Clark's testimony was inconsistent. As previously mentioned, Clark's testimony was inconsistent with the argument raised in his Motion on this point. In addition, Clark testified that during the October 2, 2018 meeting with Mr. Zacca, he both trusted Mr. Zacca and

simultaneously felt coerced by him.  Clark also testified that he wanted the appeal because he is both innocent of the crimes he plead guilty to, and because he did not understand the sentencing guidelines for the crimes he plead guilty to.

Third, Clark took no further steps after his meeting with Mr. Zacca to appeal his sentence. Clark's own testimony is that Mr. Zacca informed him of his right to appeal.  If Clark felt coerced or threatened to sign the form indicating that he did not want to appeal, he took no subsequent steps to timely file a notice of appeal, which he could have done after the October 2, 2018 meeting with Mr. Zacca and before the October 5, 2018 deadline. The Court flatly rejects Clark's false and misleading testimony.

In contrast, this Court finds that Mr. Zacca was a very credible witness during the evidentiary hearing and his testimony was also consistent with the evidence admitted during the hearing.  The Court finds that Mr. Zacca fully discussed with Clark his appellate rights as described in the letter memorializing the discussion. In fact, Mr. Zacca took all of the proper steps to advise his client of his right to appeal and honor his client's wishes.

The Court was very impressed with Mr. Zacca's representation of Clark including Mr. Zacca's careful documentation of his discussions with Clark about Clark's right to appeal and Clark's decision not to appeal. It is clear to this Court that, had Clark actually directed Mr. Zacca to file a notice of appeal, Mr. Zacca would have promptly done so. It is equally clear to this Court that Clark instructed Mr. Zacca not to file a notice of appeal. Mr. Zacca honored Clark's decision to not file a notice of appeal.

In other cases, the Undersigned United States Magistrate Judge has noted that "all defense counsel should, when advised by a client in a federal criminal case that the client does not wish to appeal, endeavor to obtain a signed written directive from the client to that effect or, if unable to

do so, to document the attorney's file with notes reflecting the client's decision and follow up with a confirmatory letter or other correspondence to the client." *Cilla v. United States,* 12-CR-60262-KAM, 2016 WL 824591, at *6, n.4 (S.D. Fla. Feb. 2, 2016), *report and recommendation adopted*, 15-60498-CIV, 2016 WL 836636 (S.D. Fla. Mar. 2, 2016); *see also Davis v. United States*, 18-80195-CR, 2021 WL 2288570, at *9 n.3 (S.D. Fla. May 4, 2021), *report and recommendation adopted*, 20-80914-CIV-JIC, 2021 WL 2288571 (S.D. Fla. June 4, 2021).[3]   In this case, Mr. Zacca did just that, and he should be commended for his diligence. Mr. Zacca represented Clark professionally and ethically in the underlying criminal case and he fully documented his file, as he should, reflecting Clark's decision to not file a notice of appeal. Clark's claims otherwise are false and frivolous.

On this record, the Court finds that Clark has not established that he reasonably demonstrated an interest in appealing or that a rational defendant would want to appeal. This is particularly true because Clark's sentence was fifteen months below the top end of the advisory guideline range. The Court further finds that Mr. Zacca fully and carefully consulted with Clark regarding his right to appeal his sentence, that Clark knowingly and voluntarily waived his right to appeal, and that Clark never instructed Mr. Zacca to file a notice of appeal. Because Clark cannot demonstrate deficiency under *Strickland*, this claim should be **DENIED**.

### B. Whether Clark's Counsel Was Ineffective For Misadvice Concerning the Consequences of Pleading Guilty

Clark asserts that Mr. Zacca was ineffective for not investigating the victim and witnesses that could have proven that Clark was innocent. [DE 17 at 3]. Clark asserts that that he constantly informed Mr. Zacca that he was innocent and instructed counsel to investigate, but that Mr. Zacca

---

[3] In both of these prior cases, the Court granted the Defendant/Movant's right to file a belated appeal. However, the facts in those cases are starkly in contrast to the facts of the instant case.

refused. *Id.* at 3-5. Clark points to the testimony in Smith's trial and claims that if Mr. Zacca had interviewed the victim and witnesses in this case, Mr. Zacca would have realized Clark was actually innocent of the charges. *Id.* Clark states that "[b]ut for counsel's ineffectiveness, the proceedings would have been so much different." *Id.* at 3. The Court finds that Clark has not demonstrated that he is entitled to relief under *Strickland*. In fact, his claim in this regard is wholly frivolous.

Because a guilty plea waives certain constitutional rights, before it is accepted, a district court must ensure that the waiver is a voluntary, knowing, and an intelligent act, done with sufficient awareness of the relevant circumstances and likely consequences surrounding the plea. *Hill v. Lockhart*, 474 U.S. 52, 56 (1985); *United States v. Ruiz*, 536 U.S. 622, 629 (2002). In other words, (1) a plea must be free from coercion; (2) the defendant must understand the nature of the charges; and (3) the defendant must know and understand the consequences of his guilty plea. *United States v. Moriarty*, 429 F.3d 1012, 1019 (11th Cir. 2005).

After the plea has been entered, a criminal defendant may not raise claims relating to the alleged deprivation of constitutional rights occurring prior to the entry of the guilty plea, but may only: (1) raise jurisdictional issues, *United States v. Patti*, 337 F.3d 1317, 1320 (11th Cir. 2003); (2) attack the voluntary and knowing character of the guilty plea, *Tollett v. Henderson*, 411 U.S. 258, 267 (1973); *Wilson v. United States*, 962 F.2d 996, 997 (11th Cir. 1992); or, (3) challenge the constitutional effectiveness of the assistance he received from his attorney in deciding to plead guilty, *United States v. Fairchild*, 803 F.2d 1121, 1123 (11th Cir. 1986). Thus, a voluntary and intelligent plea of guilty, made by an accused person, must stand unless induced by misrepresentations made to the accused person by the court, prosecutor, or his own counsel. *Brady v. United States*, 397 U.S. 742, 748 (1970). If a guilty plea is induced through threats,

misrepresentations, or improper promises, the defendant cannot be said to have been fully apprised of the consequences of the guilty plea and may then challenge the guilty plea under the Due Process Clause. *See Santobello v. New York*, 404 U.S. 257 (1971).

First, Clark has failed to allege facts demonstrating the first prong of *Strickland*, that counsel "fell below an objective standard of reasonableness" for competent counsel in misadvising Clark regarding the plea. Contrary to Clark's representations, a review of the record confirms that Clark's plea was knowing and voluntary, and not the result of misadvice or coercion from counsel or any other party. His representations now are directly refuted by his representations at the change of plea proceedings.

Specifically, at his change of plea hearing, Clark agreed with the stipulated factual proffer in which he affirmed that he used his cell phone to arrange for A.A. to meet with an adult male to engage in sex in return for money, that he knew A.A. had not attained the age of 18 years at the time of the offenses charged, and that he also conspired to cause A.A. to engage in a commercial sex act.  [DE 27-5 at 4-6; DE 27-8]. Clark also acknowledged the rights he was waiving by entering into the plea, and further denied being forced, or otherwise coerced by counsel or anyone, into changing his plea. [DE 27-8]. Moreover, by way of entering into the negotiated plea agreement, Clark was telling his lawyer not to conduct any further investigation and not present at a pre-trial or trial proceeding any legal defenses that he may be entitled to as it related to his case.

Further, the second prong of *Strickland* requires Clark to demonstrate that, but for counsel's errors or misadvice he would not have plead guilty and would have insisted on going to trial. *Hill*, 474 U.S. at 56-59; *United States v. Brown*, 752 F.3d 1344, 1347 (11th Cir. 2014). Clark has not alleged that he would have insisted on proceeding to trial, but for counsel's purported ineffectiveness. Rather, Clark alleges that "[b]ut for counsel's ineffectiveness," "the proceedings

would have been so much different."  Moreover, in exchange for his concessions, the Government agreed to recommend a two-level reduction to the level applicable to Clark's offices. Under the circumstances, because the Government had evidence that A.A. called Clark on Clark's cell phone and evidence that Clark used his phone to arrange for A.A. to meet with an adult male to have sex for money, it is not surprising that Clark chose to plead guilty rather than proceed to trial.

Clark cannot prevail on this claim as none of the arguments merit relief, having been clearly refuted by the change of plea proceedings. The record clearly establishes that Clark's attorney, Mr. Zacca, competently and zealously represented him in this case. Because Clark cannot demonstrate deficiency and prejudice under *Strickland*, this claim should be **DENIED**.

### C. Whether Clark's Counsel Was Ineffective For Not Having Clark Mentally Evaluated Under Title 18 U.S.C. §§ 4242-4247

Clark claims that Mr. Zacca was ineffective for not having Clark mentally evaluated, knowing that Clark had an I.Q. level below 65 and a history of mental illness. [DE 17 at 6]. Clark claims that "[b]ut for counsel's ineffectiveness," "the proceedings would have been so much different. Counsel prejudiced [Clark] by not requesting a mental evaluation and coerced [Clark's] plea" causing Clark to be sentenced to 220 months in prison.  *Id.* The Court finds that Clark has not demonstrated that he is entitled to relief under *Strickland*. This claim too is wholly frivolous.

First, Clark has failed to allege facts demonstrating that counsel's failure to request a mental evaluation "fell below an objective standard of reasonableness" for competent counsel. Unless there is a bona fide doubt as to a defendant's mental condition, an attorney has no duty to request a mental evaluation for the defendant. *See Drope v. Missouri*, 420 U.S. 162 (1975); *see also Dusky v. United States*, 362 U.S. 402 (1960); *Pate v. Robinson*, 383 U.S. 375 (1966). In this case, Clark has failed to adequately allege that the facts known to defense counsel would raise a reasonable doubt as to Clark's mental condition at the time of his guilty plea. To the contrary, the

record clearly indicates that a reasonable attorney in counsel's position could have concluded that

Clark was competent and capable of entering an informed plea.  Judge Middlebrooks engaged in

a very detailed and thorough colloquy at the change of plea hearing that demonstrates that that

Clark made a knowing, intelligent, and voluntary plea of guilty in this case.

BY THE COURT:

Q.      You are now under oath. If you answer falsely to any of my questions, your answer could later be used against you in another prosecution for perjury or for making a false statement; do you understand?
A.      Yes, sir.
Q.      I'm going to ask you several questions. The purpose of the questions is to make sure you have carefully considered your decision to plead guilty in this case, to determine that you are competent to make the decision, that you are aware of your rights, and that there is a reason for you to plead guilty, that you did what the Government says you did.
        If you don't understand any of my questions, tell me. If you want to stop at any point and speak with Mr. Zacca, you may do that; do you understand?
A.      Yes.
Q.       How far did you go in school?
A.      Eleventh grade.
Q.      Have you ever been treated for any mental illness?
A.      No, sir.
Q.      Have you been treated for addiction to narcotics or alcohol?
A.      No.
Q.      Are you currently under the influence of any drug or alcohol?
A.      No, sir.
Q.      Are you taking any type of medication?
A.      For high blood pressure.
Q.      Have you reviewed the second superseding indictment, the charges filed against you in this case, and have you discussed those charges with your lawyer?
A.       Yes, sir.
Q.      Are you satisfied with the representation Mr. Zacca has provided to you?
A.      Yes, sir.
Q.      I've been given a copy of a plea agreement between yourself and the Government. Let me first ask you to confirm this is your signature on the agreement.
A.      Yes, sir.
Q.      And before signing it, did you review it and discuss it with your lawyer?
A.       Yes, sir.
Q.      Do you believe you understand it?
A.      Yes, sir.

[DE 27-8 at 2-4].   It is clear from the record that Clark entered into a knowing and voluntary plea of guilty in this case. There was no reason for Mr. Zacca to have an evaluation of Clark's mental or emotional condition. Therefore, Clark failed to rebut the presumption that defense counsel's performance was objectively reasonable, and his ineffective assistance of counsel claim fails under the first prong of *Strickland*. And, the Court finds that Mr. Zacca competently and zealously represented Clark throughout this case.

Second, Clark failed to demonstrate prejudice from defense counsel's allegedly deficient performance, in that Clark failed to demonstrate that "there is a reasonable probability that, but for counsel's errors, he would not have plead guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59. Clark alleges no facts indicating that he would have refused to plead guilty and insisted on going to trial if counsel had sought a mental evaluation for Clark.  Rather, Clark alleges that "[b]ut for counsel's ineffectiveness," "the proceedings would have been so much different" and that, by not requesting mental evaluation, Clark's plea was coerced.  These claims are without merit. These allegations do not permit the Court to reasonably infer that, had counsel sought a mental evaluation, Clark would have refused to plead guilty and insisted on going to trial because they do not suggest, in any way, that a mental evaluation would have altered Clark's ultimate decision to plead guilty rather than proceed to trial. Therefore, Clark failed to sufficiently allege prejudice from counsel's alleged failure to request a mental evaluation, and his ineffective assistance of counsel claim based on such alleged failure cannot meet the second prong of *Strickland*.

Because Clark cannot demonstrate deficiency and prejudice under *Strickland*, this claim should be **DENIED**.

### D.  Whether Clark's Counsel Was Ineffective For Not Objecting To Clark's PSI Report

Clark claims that his trial attorney was ineffective for failing to object to various inaccuracies in his PSI. [DE 17 at 7]. According to Clark, these "inaccuracies" in the PSI are: (1) that Clark is actually innocent; (2) Mr. Zacca failed to object to enhancements in the PSR, and because Clark is actually innocent, Mr. Zacca should have objected to all enhancements; and (3) improper double counting in calculating his enchantments. *Id.* at 7. The Court finds that Clark has not demonstrated that he is entitled to relief under *Strickland*. This claim is also wholly frivolous.

Although Clark claims that he was actually, factually, and legally innocent of the entire case, he fails to point out specific instances where he believes Mr. Zacca should have objected. Even if Clark was able to show errors by his attorney, which he has not done, he has not demonstrated that these errors resulted in prejudice because he offers no proof that the outcome of the case would have been any different. Regardless of the claim that he was actually innocent, there is a substantial amount of evidence against Clark that would have led to the same conviction.

Moreover, at sentencing, Judge Middlebrooks commented on the strong evidence against Clark and the benefit that Clark's trial counsel secured for him regarding the guidelines by entering into the plea agreement and cooperating with the Government.

> MR. ZACCA: Absolutely. I mean, that was the incentive of signing the plea agreement was that the uncertainty of how probation would apply that five levels. And I concede that that's a consideration flowing from the plea agreement that Mr. Clark obviously is benefiting from. So that was the structure, and that was the discussions going into the plea agreement. Now, in terms of what happened in this case, that despite -- I am not going to make an argument that they are not equally culpable. I believe they are equally culpable. The facts in this case are terrible, but, Judge, I think the distinction can be drawn here, is that on a case with serious charges like this, on a case where the guidelines automatically are going to be high, Mr. Clark made a quick decision, relatively speaking. I mean, it was shortly after, I believe, the detention hearing and the arraignment that I am having discussions with Mr. Morris about structuring the plea agreement. He decided to cooperate with the government. The government was interested in his cooperation. He

communicated that he would be willing to cooperate, and he agreed to plead guilty as charged in the indictment. That's not an easy decision when, you know, there was a lot of discovery in this case, we are trying to get through it, and he's looking at a lot of time.

THE COURT: Well, he is also on the phone in the police station. I mean, he is using -- he is arranging assignation for the victim when she is using a phone she borrows in the police station. I mean, so the evidence is pretty tough.

MR. ZACCA: It's pretty tough admittedly, but, Judge, I have been in cases, and I am sure your Honor has seen cases, where the evidence seems overwhelming, but defendants are tough. They have this magical view that they are going to get away --
THE COURT: I think he made a good move, and I think you did a good job for him in terms of that enhancement.

MR. ZACCA: I appreciate that compliment, Judge, and I appreciate that observation, but I think it goes more than just that early acceptance of responsibility.

[DE 27, Ex. 10 at p. 8-10].

There is no indication that Clark's sentence would have been different, especially considering that the Court imposed a 220-month sentence as opposed to the maximum penalty of life imprisonment. Clark has raised nothing more than bare, conclusory allegations of ineffective assistance unsupported by any credible evidence. As courts have made clear in *Strickland* and its progeny, claims like this fall far short of proof required to warrant Section 2255 relief.

Finally, to the extent Clark attempts to assert an actual innocence claim, such a claim is insupportable. Courts have "equitable authority to invoke the miscarriage of justice exception to overcome expiration of the statute of limitations governing a first federal habeas petition." *McQuiggin v. Perkins*, 569 U.S. 383, 397 (2013). However, "[t]he miscarriage of justice exception…applies to a severely confined category: cases in which new evidence shows 'it is more likely than not that no reasonable juror would have convicted [the movant].'" *Id.* at 394-95 (quoting *Schlup v. Delo*, 513 U.S. 298, 303 (1995)). This type of claim is commonly referred to as

an "actual innocence" claim. *McQuiggin*, 569 U.S. at 392 (citation omitted); *see also Bousley v. United States*, 523 U.S. 614, 623 (1998).

"'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Johnson v. Fla. Dep't Of Corr.*, 513 F.3d 1328, 1334 (11th Cir. 2008) (quoting *Bousley*, 523 U.S. at 623). "Actual innocence claims must also be supported 'with new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--that was not presented at trial.'" *Rich v. Dep't of Corr. State of Fla.*, 317 F. App'x 881, 882 (11th Cir. 2008) (per curiam) (quoting *Schlup*, 513 U.S. at 324).

Clark has not met his burden here. To the contrary, on the record before this Court, there was sufficient evidence that would have been introduced at trial to support convicting Clark of the crimes charged. Moreover, as narrated above, there is no prejudice where Clark acknowledged his participation in the charged offenses. Clark's actual innocence claim is wholly frivolous.

Accordingly, because Clark fails to satisfy either prong of *Strickland* and cannot demonstrate actual innocence, this claim should be **DENIED**.

## IV.   CONCLUSION AND RECOMMENDATION

Based on the foregoing, **IT IS RECOMMENDED** that the Movant Michael Joseph Clark's Second Amended Motion to Vacate pursuant to 28 U.S.C. § 2255 [DE 16] be **DENIED**. Further, the Undersigned finds no substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000). Therefore, it is recommended that the Court **DENY** a certificate of appealability in its Final Order.

## V.   NOTICE OF RIGHT TO OBJECT

The parties shall have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with U.S. District

Judge Donald M. Middlebrooks.  Failure to file objections timely shall bar the parties from a de novo determination by the District Judge of an issue covered in the Report and Recommendation and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report and Recommendation.  *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

**RESPECTFULLY SUBMITTED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 8th day of October, 2021.

WILLIAM MATTHEWMAN
United States Magistrate Judge

28